# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT MYER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 15-71 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| NANCY GIROUX, et al., | ) | Magistrate Judge Richard A. Lanzillo |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Robert Myer ("Plaintiff"), an inmate formerly incarcerated at the State Correctional Institution at Albion ("SCI-Albion"),[1] initiated this civil rights action pursuant to 42 U.S.C. § 1983 on March 4, 2015. ECF No. 1. As Defendants, Plaintiff names Superintendent Nancy Giroux ("Giroux"); Deputy Superintendent David E. Zetwo ("Zetwo"); Licensed Psychology Manager Steven Reilly ("Reilly"); Unit Manager James Bentley ("Bentley"); and Corrections Counselor Mike Brumagin ("Brumagin"). ECF No. 62 ¶¶ 2-7. Plaintiff alleges that the Defendants violated his constitutional rights as secured by the Eighth and Fourteenth Amendments to the United States Constitution by removing his single cell status and failing to treat his mental health disorders while he was incarcerated at SCI-Albion. ECF No. 62.[2]

Presently pending before the Court is Defendants' Motion for Summary Judgment. ECF No. 91. Defendants have also supplied a Brief in Support and a Concise Statement of Material

---

[1] Plaintiff has since been transferred to the State Correctional Institution at Forest ("SCI-Forest"). ECF No. 93 ¶ 1.
[2] Although his Second Amended Complaint was drafted with the assistance of counsel, Plaintiff is currently proceeding *pro se*.

Facts. ECF No. 92, 93. Plaintiff has filed a Brief in Opposition to Defendants' motion. ECF No. 95. For the reasons set forth below, Defendant's motion will be granted.[3]

## I. Background

### A. Local Rule 56.1 Violation

Before addressing the factual background underlying this action, the Court notes that Plaintiff has failed to properly respond to Defendant's Concise Statement of Material Facts (ECF No 93), as required by Local Rule 56.C.1. This rule requires non-moving parties to a motion for summary judgment to file a responsive concise statement in which they must: respond to each numbered paragraph in the movant's concise statement; admit or deny the facts contained in the movant's concise statement; set forth the basis for denial if any fact within the movant's concise statement is not entirely admitted by the non-moving party, with appropriate citation to the record; and set forth, in separately numbered paragraphs, any other material facts at issue. See LCvR 56.C.1. Courts located in the Western District of Pennsylvania require strict compliance with the provisions of Local Rule 56. See, e.g., Coleman v. Tice, 2018 WL 5724125, at *2 n. 3 (W.D. Pa. Oct. 10, 2018), adopted by 2018 WL 5722316 (W.D. Pa. Nov. 1, 2018); First Guard Ins. Co. v. Bloom Services, Inc., 2018 WL 949224, at *2-3 (W.D. Pa. Feb. 16, 2018); Hughes v. Allegheny County Airport Authority, 2017 WL 2880875, at *1 (W.D. Pa. July 6, 2017).

A non-moving party "faces severe consequences for not properly responding to a moving party's concise statement." Hughes, 2017 WL 2880875, at *1. Any alleged material facts "set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be

---

[3] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636. See ECF Nos. 9, 33.

undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party." LCvR 56.E. While courts provide some leniency to *pro se* litigants when applying procedural rules, the Court "'is under no duty to provide personal instruction on courtroom procedure or to perform any legal chores for the [*pro se* litigant] that counsel would normally carry out.'" Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244 (3d Cir. 2013) (quoting Pliler v. Ford, 542 U.S. 225, 231 (2004)). Nor may *pro se* litigants ignore procedural rules that apply to parties assisted by counsel. McNeil v. United States, 508 U.S. 106, 113 (1993) (explaining that "we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel").

Accordingly, to the extent that Plaintiff has failed to respond to any concise statement of material fact, that concise statement of material fact will be deemed admitted. LCvR 56.E. However, the Court will consider any facts properly alleged in Plaintiff's *pro se* responses that specifically contradict Defendant's statement of facts, to the extent that they are supported by the record. Boyd v. Citizens Bank of Pa., Inc., 2014 WL 2154902, at *3 (W.D. Pa. May 22, 2014) (stating that "[t]o the extent Plaintiff's statement of 'fact' specifically controverts Defendant's, the Court will consider these facts in determining whether summary judgment should be granted").

B.    Facts

Plaintiff's allegations in the instant action stem from Defendants' decision to remove his single-cell designation for a portion of his incarceration at SCI-Albion between December 13, 2011, and October 26, 2017. ECF No. 93 ¶¶ 15, 72. Prior to his arrival at SCI-Albion, Plaintiff had been assigned "Z-code status," meaning that he was required to be housed in a single occupancy cell. Id. ¶ 13; ECF No. 94-3 at 10; ECF No. 94-4 at 111. Pursuant to the Department

of Corrections' ("DOC") Policy and Procedures Manual in effect at that time, an inmate was assigned Z-code housing status if, *inter alia*, he had been "evaluated by psychiatric or psychological staff as having mental health problems" or if he had "a documented history of aggressive or predatory behavior towards cell partners or who staff has reason to believe would exhibit assaultive or predatory behavior towards cell partners." ECF No. 93 ¶ 14. Examples of mental health problems included: dangerous to self; dangerous to others; self-mutilative; unable to care for self; and/or "active on the Psychiatric Review Team (PRT) roster." Id. An inmate's Z-code status was "reviewed at least annually" to ensure that the code remained appropriate. Id.

The record is somewhat unclear as to the basis for Plaintiff's initial designation as a Z-code inmate. According to Plaintiff, he was assigned a Z-code because he was diagnosed in 2005 with several mental health disorders including insomnia, anxiety and emotional deficiency attention disorder. ECF No. 95-1. However, notes from his prison mental health file suggest that he was "given a Z code in 2009 for assaultive behavior" towards another inmate. ECF No. 94-4 at 111. An altercation with another inmate also precipitated Plaintiff's transfer into SCI-Albion from his prior location at SCI-Fayette. ECF No. 93 ¶ 18.

In any event, Plaintiff arrived at SCI-Albion as a Z-code inmate and was promptly evaluated by the prison's Psychology Department. Id. ¶ 16. The DOC evaluates inmates with mental health problems pursuant to a mental health stability classification system that requires each inmate to be ranked on a scale from A to D. ECF No. 94-1 ¶ 8. As explained in the DOC Policy and Procedures Manual:

> The mental health needs of an inmate shall be rated on a four-point nominal scale system in which a rating "A" suggests no serious need; "B" shall reflect previous mental health needs; "C" reflects present mental health needs; and "D" designates the most serious need for mental health services due to clinical assessment of demonstrated

> functional impairment and/or [Serious Mental Illness] and [Intellectual Disability].

Id. Throughout the majority of his incarceration at SCI-Albion, Plaintiff was designated as a "B" inmate, meaning that he had an identified history of psychiatric issues but required no current treatment. Id. ¶ 29. Nevertheless, he received regular visits "at a minimum of two to three times per month" from a Psychological Services Specialist ("PSS") during portions of his stay at SCI-Albion. Id. He also received regular care from a psychiatrist and periodically obtained prescriptions for medications such as Haldol, Prozac and Trazodone. Id. ¶ 30.

On February 5, 2013, the Psychology Department conducted an annual review of Plaintiff's Z-code status. Id. ¶ 21. The staff member who performed the review, K. Suesser, noted that Plaintiff had a history of assaultive behavior and violent misconducts and recommended that Plaintiff's Z-code status be maintained at that time. Id. ¶ 22. Suesser issued a similar recommendation following another review on December 17, 2013. Id. ¶ 24.

Plaintiff's Z-code status was reviewed again on April 24, 2014. Id. ¶ 25. Reilly, performing the initial assessment, concluded that Plaintiff's "Z-code [was] not supported by Mental Health criteria." Id. ¶ 27. He observed:

> Inmate does not meet the mental health diagnostic criteria for Z-code status. Reports a history of institutional assault. Moreover, reports he will ask for self lock-up, if required to double cell.

Id. Following Reilly's assessment, the Psychology Department recommended "the lifting of [Plaintiff's] 'Z' code at this time due to his stabile adjustment and not having a Mental Health based need for its assignment." Id.

Based on the Psychology Department's recommendation, a standard DOC form called a Vote Sheet (DC-46) was circulated to Plaintiff's Unit Team, a group comprised of the

Defendants and a handful of other prison officials.  ECF No. 93 ¶ 28; ECF No. 94-1 ¶ 19.  The

Unit Team made the following observations:

> [Plaintiff] was assigned a "Z" code on 2/25/09.  He previously received
> Assault misconducts on 3/28/07 and 12/18/02 and Fighting misconducts
> on 1/24/11, 2/3/09, and 3/9/07.  He has had no additional assaults since
> the "Z" Code was assigned.  Psychology recommends the lifting of his
> "Z" code at this time due to his stabile adjustment and not having a
> Mental Health based need for its assignment.

ECF No. 94-3 at 16.  Consistent with these observations, the Unit Team voted unanimously to

remove Plaintiff's Z-code status.  <u>Id</u>.  Plaintiff's counselor, Brumagin, voted "YES," noting

"Stabile Adjustment, No MH concerns."  <u>Id</u>.  Reilly voted "YES" without comment.  <u>Id</u>.  Bentley

and Zetwo each voted "YES" with the notation, "per psych."  <u>Id</u>.  Giroux, with whom the final

decision rested, voted "YES" and noted "Remove z-code Per Psychology."  <u>Id</u>.

On April 24, 2014, Plaintiff sent a memo to Bentley objecting to the removal of his Z-

code based on his past "predatory aggressive ASSAULTIVE BEHAVIOR."  ECF No. 94-3 at

18.  After describing several of his prior assaults, Plaintiff stated:

> THE RELEVANT DOC EMPLOYEES, IN THEIR INDIVIDUAL @
> OFFICIAL CAPACITY WILL BE HELD LIABLE FOR ANY
> NEGLECTFUL ACTIVITIES ON THEIR BEHALF, SINCE THEY
> ARE AWARE OF MY ASSAULTTIVE HISTORY AND ARE STILL
> ATTEMPTING TO REMOVE MY Z-CODE; I WILL NEVER TAKE A
> CELL-MATE BECAUSE I AM INCOMPETENT TO LIVE WITH
> ANOTHER PERSON IN A CELL – MY HISTORY DEMONSTRATE
> THAT IT IS A SUBSTANTIAL RISK BECAUSE A KILLING OR
> VICIOUS STABBING MAY OCCUR – I CANNOT LIVE WITH
> ANOTHER PRISONER IN A CELL – I'M TELLING YOU NOW –
> PERIOD.

<u>Id</u>. at 18-19.  Despite Plaintiff's objection, the DOC officially removed his Z-code status on May

5, 2014.  ECF No. 93 ¶ 30.

Between November 5, 2014, and April 14, 2016, Plaintiff received a series of

misconducts for refusing to take a cellmate.  ECF No. 93 ¶¶ 35, 38.  Each of those misconducts

resulted in a sanction of either thirty or sixty days in the Restricted Housing Unit ("RHU").  Id. ¶ 39.  By the Court's calculation, Plaintiff spent over 480 days in solitary confinement as a direct result of his refusal to share a cell.  Id.  Throughout his time in the RHU, Plaintiff continued to receive care from a psychiatrist and a PSS.  Id. ¶¶ 42-43.

On April 4, 2016, Plaintiff was placed in a Psychiatric Observation Cell ("POC") after he threatened to commit suicide and smeared garbage and feces around his cell.  ECF No. 94-1 at 21; ECF No. 94-4 at 5.  He was placed in a POC again on April 22, 2016, based on a similar incident.  ECF No. 93 ¶ 50.  During these times, Plaintiff received around-the-clock attention from medical staff and frequent visits from Psychology and Psychiatry.  ECF No. 94-1 at 21.  As a result of those episodes, Plaintiff's mental health classification was elevated to "C".  Id.

Although it is somewhat unclear from the record, it appears that Plaintiff moved into a double cell with another inmate for the first time in April 2016.  ECF No. 94-1 at 5.  On August 21, 2016, Plaintiff attempted to assault his cellmate with a homemade weapon in the common area of their housing unit.  ECF No. 93 ¶ 55.  Following a hearing, Plaintiff received a sanction of 180 days of disciplinary confinement.  Id. ¶ 61.

On January 26, 2017, the Psychology Department conducted another review of Plaintiff's Z-code status.  Id. ¶ 66.  PSS Mary Beth Anderson received the referral for Plaintiff's evaluation. Id.  Although she observed that Plaintiff "[did] not have a serious mental illness," Anderson noted that Plaintiff had an established history of assaultive behavior.  Id. ¶ 67.  Based on Plaintiff's history, Anderson issued the following recommendation:

> Due to the Diagnosis of [Anti-Social Personality Disorder], his impulsivity, lack of empathy and remorse, it is recommended that he be given a Z code before he is returned to [General Population].  There is a high likelihood that he will assault another inmate if placed in his cell.

Id. ¶ 68.  After circulation of a Vote Sheet, Plaintiff's Z-code status was restored on February 15, 2017.  Id. ¶¶ 69, 71.  Deputy Superintendent Mindy Adams, while voting to approve Plaintiff's Z-code, added the comment: "z code was removed.  Inmate continues to up his [misconducts]/assaults.  Proves will do what necessary."  Id. ¶ 70.

On October 26, 2017, Plaintiff was transferred to SCI-Forest.  Id. ¶ 72.  As of the date of this opinion, Plaintiff still has Z-code status.

## II.     Standard of Review

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Rule 56(e)(2) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. Fed.R.Civ.P. 56(c). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989) (the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Rather, the court is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Id. The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson, 477 U.S. at 248. Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 247-249.

"Where the party opposing a motion for summary judgment bears the ultimate burden of proof, the moving party may discharge its initial burden of showing that there is no genuine issue of material fact 'by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" Player v. Motiva Enterprises, LLC, 240 Fed.Appx 513, 522 n4 (3d Cir. 2007) quoting UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004). If the moving party has satisfied its initial burden, the nonmoving party must, in their opposition to the motion, identify evidence of record that creates a genuine issue of material fact. Childers v. Joseph, 842 F.2d 689, 694-95 (3d Cir. 1988).

## III.  Discussion

### A.  Official Capacity Claims

Before reaching the merits of Plaintiff's claims, the Court observes that Plaintiff has sued each of the Defendants in their respective "individual and official capacity." ECF No. 62 ¶¶ 2-5, 7. However, it is well-settled that "the Eleventh Amendment proscribes actions in the federal courts against states, their agencies, and state officials acting within their official capacities." See, e.g., O'Donnell v. Pennsylvania Dept. of Corrections, 790 F.Supp.2d 289, 305 (M.D. Pa. 2011) (citing Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996)). "Because the Pennsylvania DOC is a part of the executive department of the Commonwealth of Pennsylvania, its employees share in the Commonwealth's Eleventh Amendment immunity to the extent that they were sued in their official capacities." Johnson v. Wenerowicz, 440 F. App'x 60, 62 (3d Cir. 2011). Consequently, the Defendants – each of whom is an official, officer, or employee of the Commonwealth of Pennsylvania – are entitled to immunity from any monetary claims against them in their official capacities.

Plaintiff is also seeking injunctive and declaratory relief against the Defendants based on the same conduct underlying his claims for monetary relief. While it is true that Eleventh Amendment immunity does not apply to claims for injunctive relief against state officials to enjoin conduct alleged to be an ongoing violation of federal law or the Constitution, see Ex Parte Young, 209 U.S. 123, 129 (1908), such claims must be based on an ongoing violation, rather than past conduct. Seminole Tribe, 517 U.S. at 73. Consequently, "[a]n inmate's transfer from the facility complained of generally moots [his] equitable and declaratory claims." Abdul-Akbar v. Watson, 4 F.3d 195, 206 (3d Cir. 1993). In light of Plaintiff's transfer from SCI-Albion to SCI-Forest, and the reinstatement of his Z-code status, his requests for injunctive and declaratory relief have been rendered moot. Accordingly, Defendants are entitled to summary judgment on each official capacity claim asserted in the Second Amended Complaint.

**B. Eighth Amendment – Cruel and Unusual Punishment**

Turning to the substance of Plaintiff's claims, he first alleges that the decision to rescind his Z-code status and force him to take a cellmate violated the Eighth Amendment's prohibition against cruel and unusual punishment. Courts have widely recognized that the denial of Z-code status, standing alone, is not cruel and unusual punishment and does not rise to the level of an Eighth Amendment violation. Mattis v. Department of Corrections, 2017 WL 6406884, at *12 (W.D. Pa. Dec. 15, 2017). See also Henry v. Wilson, 2007 WL 2746717, at *5 (W.D. Pa. Sept. 17, 2007) ("The Supreme Court specifically has held that double-celling is not prohibited by the Eighth Amendment.") (citing Rhodes v. Chapman, 452 U.S. 337 (1981)). However, "double celling can amount to an Eighth Amendment violation if combined with other adverse conditions." Nami v. Fauver, 82 F.3d 63, 67 (3d Cir. 1996). To establish a violation, the inmate must demonstrate that prison officials had actual knowledge of "an excessive risk to inmate

health or safety" and "disregarded" this risk.  Farmer v. Brennan, 511 U.S. 825, 837 (1994);

Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001).

Here, Plaintiff alleges that his pre-existing mental health conditions are exacerbated when he is forced to live with a cellmate, causing him to experience mental anguish and psychological harm.  ECF No. 95 at 13-17.  However, an inmate's psychological aversion to sharing a cell does not give rise to an Eighth Amendment violation where the inmate has otherwise received adequate care for his mental health disorders.  In Henry, for example, the plaintiff alleged that his confinement in a double cell caused him to experience psychological torment including "nervous tension, emotional anguish, nausea, anxiety, headaches, insomnia, panic and [an inability] to function in his daily activities."  2007 WL 2746717, at *2.  His medical records indicated, however, that he had "received constant psychological treatment" for his perceived disorders.  Id. at *5.  The court granted summary judgment in favor of the defendants on his Eighth Amendment claim, explaining:

> In the case at bar, Plaintiff received constant psychological treatment for his anxieties.  Dr. Saavadra determined that Plaintiff's medical needs did not require single cell status.  In fact, the psychology department at the institution determined that Plaintiff did not exhibit any legitimate need for single cell status and found that he was "anti-social, untruthful and manipulative."  His numerous mental health evaluations indicate that there are no significant health indicators that require Z Code status.  DOC officials reasonably relied on these evaluations in refusing to grant him single cell status.  There simply is nothing in the record that suggests that any Defendant knew that Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.

Id. at *5 (citations omitted).

Similarly, in Hughes v. Miskell, the plaintiff alleged that "his medical and mental health conditions required him to have Z-Code single status" because, *inter alia*, "he had difficulties with cell mates and [having] a cell mate was a source of stress for him exacerbating his

12

conditions." 2013 WL 5488654, at *12 (M.D. Pa. Sept. 30, 2013). The Court rejected plaintiff's

Eighth Amendment claim because, *inter alia*, he had received consistent treatment and

evaluation for his perceived disorders. Id. at *22. Cf. James v. Sauers, 2018 WL 1178370, at

*6-7 (W.D. Pa. Jan. 30, 2018) (rejecting an Eighth Amendment claim based on revocation of Z-

code status where the record reflected that defendants "reviewed Plaintiff's institutional file,

including his medical and psychological records" and "determined that there were no policy

criteria upon which to continue Plaintiff's Z-code status").

      As in each of the foregoing cases, Plaintiff received frequent and comprehensive mental

health treatment while incarcerated at SCI-Albion. Plaintiff was designated a "B roster" inmate

for the majority of the pertinent time period, indicating that he had been treated for mental health

issues in the past but no longer required psychiatric treatment. ECF No. 93 ¶ 42. Plaintiff also

received mental health evaluations on numerous occasions, both prior to and following the

removal of his Z-code, none of which revealed any serious mental health issues. For example, in

2011, when he arrived at SCI-Albion, he told the Psychology Department that he was

"situationally depressed due to having to be in a camera cell" but denied any mental health issues

or suicidal ideations. Id. ¶¶ 16-17. In April 2014, Reilly noted that Plaintiff had no mental

health concerns and demonstrated "stabile adjustment." Id. ¶ 25. Throughout 2014, 2015, and

2016, the Psychology Department continued to assess Plaintiff at the beginning of each of his

disciplinary admissions to the Restricted Housing Unit. Plaintiff also had "regular mental health

contacts with the Psychological Services Specialists from the Psychology Department at SCI-

Albion, with these documented contacts occurring at a minimum of two to three times per

month." ECF No. 94-1 at 21, ¶ 29. Plaintiff also received routine care from a psychiatrist and

prescription medications as needed. Id. at 21, ¶ 30. Despite the frequency of Plaintiff's

interactions with the prison's Psychology Department, no specific mental health issues were identified during any of those evaluations. Id.

In short, the record reflects that Plaintiff received frequent mental health evaluations and treatments while incarcerated at SCI-Albion and that prison officials reasonably relied on those evaluations in concluding that no substantial risk of serious harm attached to their decision to revoke his single cell status. To the extent that Plaintiff believes otherwise, he has failed to adduce any evidence to support that averment, let alone sufficient evidence to create a triable issue of material fact. Because summary judgment is "'put up or shut up' time for the non-moving party," Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), Plaintiff's failure to substantiate his claim is determinative. Summary judgment will be granted in favor of Defendants as to this claim.

**C. Eighth Amendment – Failure to Protect**

As a corollary to the Eighth Amendment's prohibition against cruel and unusual punishment, the Constitution imposes a duty on prison officials to "take reasonable measures to guarantee the safety of inmates." Hudson v. Palmer, 468 U.S. 517, 526-27 (1984). This includes the general duty to "protect prisoners from violence at the hands of other prisoners." Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997) (quoting Farmer, 511 U.S. at 833). To state a viable failure-to-protect claim, the plaintiff must establish that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was deliberately indifferent to that substantial risk; and (3) the defendant's deliberate indifference caused the plaintiff to suffer harm. Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012). The standard for deliberate indifference is subjective; the prison official "must actually have known or been aware of the excessive risk to inmate safety." Beers-Capitol, 256 F.3d at 125. Critically, an official's

awareness "of overall violence among the inmates or of violent propensities (or history of violence) of particular inmates does not supply an inference of deliberate indifference." Buckley v. Kowalski, 2015 WL 179385, at *4 (D.N.J. Jan. 14, 2015) (citing Bistrian, 696 F.3d at 371). In other words, a generalized, hypothetical "risk that an inmate with a history of violence might attack another inmate" is too "speculative" to support an Eighth Amendment violation. Bistrian, 696 F.3d at 371.

In the instant case, Plaintiff contends that Defendants "knew that [he] had a long history of serious aggressive assaultive behavior while incarcerated" but "failed to take reasonable measures to guarantee the safety of [himself] and other inmates with whom [he] came in contact." ECF No. 62 ¶¶ 47, 49. Although the record corroborates Plaintiff's history of assaulting other inmates, there is no evidence that he was ever assaulted or injured during the brief period of time in which he was actually double celled with another inmate.[4] Instead, Plaintiff claims that his aggressive tendencies "could [have] caused him to get harmed by a cellmate." ECF No. 95 ¶ 15. Defendants dismiss this type of allegation as too generalized and speculative to support an Eighth Amendment violation.

---

[4] Plaintiff's failure to establish that another inmate actually attacked him is not fatal to his claim. Rather, a prison officials' failure "to act reasonably to ensure a safe environment for a prisoner when they are aware that there is a significant risk of serious injury to that prisoner . . . violates that prisoner's rights, whether or not an attack actually occurs, and if it does occur, whether or not the injuries suffered in an attack are serious." Heisler v. Kralik, 981 F.Supp. 830, 837 (S.D.N.Y. Oct. 29, 1997). See also Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir. 1985) ("An inmate's right to be protected from constant threats of violence and sexual assault from other inmates does not require that he wait until he is actually assaulted before obtaining relief."). However, as noted by several courts in this district, the lack of actual physical injury precludes an inmate from seeking compensatory damages under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e). See, e.g., 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act"); Hubert v. Wetzel, 2018 WL 4828470, at *6 (W.D. Pa. Oct. 4, 2018) (allowing failure to protect claim to proceed based on "an elevated risk of violence and at least one indirect threat of assault" but precluding compensatory damages based on the PLRA's physical injury requirement); Burbage v. Sullen, 2018 WL 3060086, at *6 (M.D. Pa. May 3, 2018) (same).

In <u>Bistrian</u>, the Third Circuit used two incidents of inmate assault, each perpetuated against the same unfortunate inmate, to illustrate the "crucial distinction" between a scenario in which prison officials were actually aware of an excessive risk to inmate safety, and one in which the risk of harm to the inmate was merely speculative. <u>See</u> <u>Buckley</u>, 2015 WL 179385, at *4 (citing <u>Bistrian</u>, 696 F.3d at 371). In the first scenario, the inmate, Peter Bistrian, had been recruited by prison officials to assist the FBI with an investigation into a prison gang. <u>Bistrian</u>, 696 F.3d at 360. Bistrian, a prison orderly, had been engaged by several gang members to assist them by passing along written notes. <u>Id</u>. The FBI asked Bistrian to copy each note and provide the copy to prison officials before delivering the original to the intended recipient. <u>Id</u>. However, the sloppy nature of the operation alerted gang members to Bistrian's participation in the FBI investigation. <u>Id</u>. at 360-61. Several members of the gang began threatening to "seriously harm [Bistrian] if they were placed in the recreation yard with him at the same time." <u>Id</u>. at 361. Despite Bistrian's repeated pleas to prison officials for protection, he was placed in a locked recreation yard pen with those same gang members less than a month later. <u>Id</u>. They beat him savagely, resulting in "a dislocated left shoulder, broken teeth, and multiple contusions and lacerations to his head and face that required sutures." <u>Id</u>.

Four months later, Bistrian was placed in the recreation yard with an inmate who had a history of random and violent attacks on other inmates. <u>Id</u>. at 362. While Bistrian was in hand restraints, the other inmate attacked him with a "manufactured razor-blade style weapon, repeatedly slashing and cutting [his] face, arms, and legs." <u>Id</u>. Bistrian sued, alleging that prison officials had failed to protect him from either attack despite their subjective awareness of the risk of harm presented by each of the attackers.

Examining the two scenarios, the Third Circuit drew a line between the first attack, which "alleged a sufficiently plausible failure-to-protect claim," and the second attack, which was "based on a mere possibility of harm." Buckley, 2015 WL 179385, at *4 (discussing Bistrian, 696 F.3d at 369-71). Addressing the first attack, the Court held:

> Bistrian [has] set[] out sufficient factual allegations, which we must accept as true, that make his repeated pleas radically different from an out-of-the-blue and unadorned "I'm-in-trouble" entreaty. The eight officials that Bistrian claims he "repeatedly advised (both verbally and in writing)" were the very officials that orchestrated the botched note-photocopying operation. Given their familiarity with the scheme and the players involved, it is quite plausible that they knew Bistrian's cries for help were legitimate and that he faced a substantial risk of serious harm. After all, the genesis of the operation was a desire to assist an FBI investigation into violent criminal activity by [gang members] that included, among other things, substantial witness intimidation.

Bistrian, 696 F.3d at 369-70 (citations omitted). In contrast, the Court held that Bistrian's allegations with respect to the second attack were too speculative to state a claim:

> Bistrian does not allege that [the second attacker] had any connection to [the gang] or that [he] otherwise attacked him because he was an informant. Instead, Bistrian refers to [the second attacker's] "history of violent assaults against other inmates" . . . and generally creates the impression that [the] attack was unprovoked, inexplicable, and unrelated to his participation in the note-copying operation. Thus, according to Bistrian, the risk of the harm that occurred was the risk that an inmate with a history of violence might attack another inmate for an unknown reason. We cannot conclude on these allegations that prison officials were deliberately indifferent to such a speculative risk.

Id. at 371 (citations omitted).

Plaintiff's allegations fall squarely into the latter category. There is no evidence in the record to suggest that Plaintiff was ever threatened with physical harm or assaulted. Instead, he asserts that prison officials should have known that *he would assault someone else* based on his own history of violence and aggression. However, Plaintiff cannot establish a failure to protect claim based on prison officials' failure to protect other inmates from himself. To the extent that

17

Plaintiff implies that his own violent background might have provoked another inmate to respond with violence, either preemptively or reactively, he has not provided any evidentiary support for this supposition. As such, his attempt to demonstrate a substantial risk of harm based on nothing more than his own general propensity toward violence represents the type of speculative entreaty that the Third Circuit and other courts have routinely deemed inadequate to support an Eighth Amendment claim. <u>Bistrian</u>, 696 F.3d at 369-71 (rejecting an inference of deliberate indifference based solely on a prison official's awareness of a particular inmate's propensity for violence); <u>Buoniconti v. City of Philadelphia</u>, 148 F.Supp.3d 425 (E.D. Pa. 2015) (allegation that attackers had a history of "known prior violent acts and propensity for violence" insufficient to establish deliberate indifference); <u>Buckley</u>, 2015 WL 179385, at *5 (allegation that defendant had called plaintiff a "child molester," combined with general animosity of prison population towards child molesters, was too speculative to create an inference of deliberate indifference). Because Plaintiff's allegations are insufficiently particularized, and because the only specific threat identified in the record was directed towards individuals other than the Plaintiff, Plaintiff's failure to protect claim must fail.

### D.  Eighth Amendment – Denial of Medical Care

Plaintiff next contends that Reilly deprived him of medically necessary mental health care in relation to the revocation of his Z-code status. Plaintiff characterizes his Z-code as a form of "psychological therapy" and suggests that the removal of that status violated the Eighth Amendment. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976) (stating that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment") (internal quotation omitted).

18

To establish a violation of his constitutional right to adequate medical care, a plaintiff is required to point to facts that demonstrate: (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). However, "an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim." Tillery v. Noel, 2018 WL 3521212, at *5 (M.D. Pa. June 28, 2018) (collecting cases). This is because "the exercise by a doctor of his professional judgment is never deliberate indifference." Gindraw v. Dendler, 967 F. Supp. 833, 836 (E.D. Pa. 1997) (citing Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.")). "Therefore, where a dispute in essence entails nothing more than a disagreement between an inmate and doctors over alternate treatment plans, the inmate's complaint will fail as a constitutional claim under § 1983." Tillery, 2018 WL 3521212, at *5 (citing Gause v. Diguglielmo, 339 Fed. Appx. 132 (3d Cir. 2009) (characterizing a dispute over pain medication as the type of "disagreement over the exact contours of [plaintiff's] medical treatment" that does not violate the constitution)).

Plaintiff's medical indifference claim falls short in two respects. First, the record clearly establishes that Plaintiff received frequent and routine mental health care from psychologists and psychiatrists at SCI-Albion, both prior to and after the revocation of his Z-code. "[C]ourts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care." Hensley v. Collins, 2018 WL 4233021, at *3 (W.D. Pa. Aug. 15, 2018) (quoting Clark v. Doe, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000)). See also Wisniewski v. Frommer, -- Fed. Appx. --, 2018 WL 4776165, at *3 (3d Cir. Oct. 3, 2018) (noting that "there is a critical distinction 'between cases where the complaint alleges a complete denial of medical

care and those alleging inadequate medical treatment.'") (quoting <u>Pearson v. Prison Health Serv.</u>, 850 F.3d 526, 535 (3d Cir. 2017)). Because Plaintiff received frequent treatment for his mental health conditions, any perceived "inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim." <u>Norris v. Frame</u>, 585 F.2d 1183, 1186 (3d Cir. 1978).

Secondly and more critically, the record reflects that Reilly relied on his medical expertise and judgment in issuing his recommendation that Plaintiff's Z-code status be removed. Prior to making his recommendation, Reilly examined Plaintiff's entire prison file, including his medical and psychological records, and conducted an in-person evaluation. Based on that review, Reilly concluded that Plaintiff no longer warranted a Z-code "due to his stabile adjustment and not having a Mental Health based need for its assignment." He arrived at this conclusion after conducting a reasonable investigation and exercising his sound professional judgment. Although Plaintiff disagrees with Reilly's conclusion, an inmate's disagreement with prison medical staff as to the medical necessity of a Z-code is insufficient to support an Eighth Amendment violation. <u>See</u>, <u>e.g.</u>, <u>DeFranco v. Wolfe</u>, 387 Fed. Appx. 147, 158-59 (3d Cir. 2010) (finding no Eighth Amendment violation where the plaintiff and prison medical professionals disagreed as to the medical necessity of plaintiff's Z-code and where "the record reflect[ed] that the committees that assign Z-codes considered the medical reports and a doctor's conclusion that [plaintiff's] condition would be adequately treated with medication"); <u>Rivera v. Ed Rendell</u>, 2018 WL 3659935, at *5 (M.D. Pa. Aug. 2, 2018) ("At its core, Rivera's claim is based on a disagreement with the medical professionals' assessment of his mental health condition (and [the deputy superintendent's] reliance on that assessment when he found that [plaintiff] did not meet the criteria for a Z Code in March 2009). But such a disagreement does not amount to deliberate indifference."); <u>James</u>, 2018 WL 1178370, at *6-7 (rejecting an Eighth Amendment claim based

on revocation of Z-code status where the record reflected that defendants "reviewed Plaintiff's institutional file, including his medical and psychological records" and "determined that there were no policy criteria upon which to continue Plaintiff's Z-code status" based on "the lack of significant or current mental health treatment, lack of medical needs, and the absence of adjustment issues in the previous ten-year period."). Reilly's motion for summary judgment will be granted as to this claim.

### E. Fourteenth Amendment – Due Process

Finally, Plaintiff asserts that Defendants violated the Due Process Clause of the Fourteenth Amendment by removing his Z-code status, causing him to incur "over 570 days in solitary confinement" and exacerbating his mental health issues. ECF No. 62 ¶ 62. Although captioned as a substantive due process claim in his pleading, Plaintiff actually appears to be asserting a procedural due process claim based on the alleged deprivation of a protected liberty interest.[5]

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." Wilkinson v. Austin, 545 U.S. 209, 221 (2005). In analyzing a procedural due process claim, "the first step is to determine whether the nature of the

---

[5] To the extent that Plaintiff actually intended to assert a substantive due process claim (based, perhaps, on his contention that Defendants acted with deliberate indifference to the mental and physical impact of long-term confinement in segregated housing), that claim would be barred by the explicit source rule. The explicit source rule provides that, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." U.S. v. Lanier, 520 U.S. 259, 272 n. 7 (1997). Courts have routinely dismissed Fourteenth Amendment claims asserting deliberate indifference to an inmate's conditions of confinement because such claims are more-specifically "covered" by the Eighth Amendment's prohibition of cruel and unusual punishment. See, e.g., Porter v. Penn. Dep't of Corrections, 2018 WL 5846747, at *9 (W.D. Pa. Nov. 8, 2018) (precluding plaintiff from "simultaneously pursuing a substantive due process claim" based on "the physical and psychological harms caused by long term solitary confinement" because such claims are covered by the Eighth Amendment).

interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000). If the asserted interest falls within the protections of the Due Process Clause, the second step is to determine whether the plaintiff was afforded "all of the process he was due." Id.

In the prison context, a protected liberty interest arises only where a restraint "imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life." Williams v. Secretary Pennsylvania Dep't of Corrections, 848 F.3d 549, 558-59 (3d Cir. 2017) (emphasis in original) (citations omitted). In determining whether a condition of confinement creates a protected liberty interest, a court must consider: "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000).

There is no question that the removal of Plaintiff's Z-code, standing alone, does not implicate a protected liberty interest. See, e.g., Mattis, 2017 WL 6406884, at *13 (holding that "the removal of Plaintiff's Z-code does not implicate a recognized liberty interest," dooming his Fourteenth Amendment claim); Hodges v. Wilson, 341 Fed. Appx. 846, 849 (3d Cir. 2009) ("[W]e agree with the District Court that Hodges has not been subjected to atypical and significant hardship because his 'Z' code status has been revoked and he must now share a cell."); Rivera v. Rendell, 2013 WL 1339273, at *10 (M.D. Pa. Apr. 1, 2013) ("[I]nmates do not have a liberty interest in being single celled"). However, Plaintiff argues that the removal of his Z-code caused him to "suffer over 570 days in solitary confinement," exacerbating his existing mental health problems and creating psychological trauma such as depression, anxiety, and suicidal ideation. ECF No. 62 ¶ 62; ECF No. 95 at 31. Citing the Third Circuit's recent decision

in Williams, 848 F.3d at 566, Plaintiff contends that the removal of his Z-code, in conjunction with the prolonged solitary confinement that ensued, amounts to a constitutional violation. ECF No. 95 at 30.

In Williams, the Third Circuit delved into the "robust body of scientific research on the effects of solitary confinement" and concluded that indefinite exposure to isolated confinement causes "deep and long-term psychic harm" and "poses a grave threat to well-being." Id. at 566. Because such harm "is the essence of the atypical and significant hardship inquiry," the Court held that the plaintiffs, each of whom had been indefinitely confined on death row for several years after their death sentences had been overturned, possessed a "due process right to be free from indefinite conditions of solitary confinement." Id. at 566, 574-75.

Notably, the Third Circuit did *not* pronounce that any and every exposure to solitary confinement violates the Constitution. Such a holding would have run afoul of the United States Supreme Court's prior decision in Sandin v. Conner, 515 U.S. 472 (1995), in which the Court held that a thirty-day stay in solitary confinement did not give rise to a protected liberty interest. Id. at 486-87. Rather, the Third Circuit held that inmates have a clearly established Fourteenth Amendment right to avoid *unnecessary, unexamined and indefinite* solitary confinement. Williams, 848 F.3d at 574. As explained by the Court:

> Here, as in [Wilkinson v. Austin, 545 U.S. 2009 (2005)] and Shoats, Plaintiffs' placements on death row were indefinite. In Wilkinson, "placement at [the Supermax] is for an indefinite period of time, limited only by an inmate's sentence. For an inmate serving a life sentence, there is no indication how long he may be incarcerated ... once assigned there." And in Shoats, we found the deprivations were indefinite because there was no maximum period for the inmate's placement in solitary confinement. Likewise, Plaintiffs' continued confinement on death row after their death sentences were vacated continued for years with no ascertainable date for their release into the general population. Plaintiffs could not even hope to be released based on prison PRC review because these pro forma assessments did not consider the necessity of their

severe conditions of confinement. Obviously, had Plaintiffs' respective
appellate proceedings stretched far beyond six and eight years, so would
their respective placements on death row. Indeed, Defendants argue this
is precisely what the DOC policy would have required. In Defendants'
view, so long as re-imposition of the death penalty was possible, the
automatic deprivations of death row were mandatory.

This indefiniteness contrasts sharply with other common forms of
solitary confinement, such as the punitive segregation that is discussed in
Sandin. The duration of the deprivations that follow from that seclusion
is often predetermined and fixed unless the inmate's behavior is thought
to require an additional period of segregation. Here, Walker and
Williams could have been the most compliant inmates in a given facility,
and exhibited no signs they would endanger themselves or others. They
would still have been relegated to death row indefinitely even though
they had won new sentencing proceedings and were not under active
sentences of death.

Id. at 562.

Unlike the unnecessary, unexamined and indefinite solitary confinement addressed in

Williams, Plaintiff's disciplinary stints in solitary confinement were finite in duration, subject to

periodic review, and served a valid penological purpose. Each sanction was precipitated by an

acute incident of misconduct, to wit, Plaintiff's refusal to obey orders to select a cellmate. The

Third Circuit explicitly distinguished this type of disciplinary sanction from the indefinite

segregation at issue in Williams. See Williams, 848 F.3d at 562 (noting that indefinite solitary

confinement "contrasts sharply with other common forms of solitary confinement, such as . . .

punitive segregation"). Moreover, each sanction was for a specific, predetermined, limited

duration. See Sandin, 515 U.S. at 485-86 (holding that a finite period of solitary confinement for

disciplinary purposes "does not present a dramatic departure from the basic conditions of

[plaintiff's] indeterminate sentence"). Finally, Plaintiff received a misconduct hearing prior to

each disciplinary sanction and periodic review of his placement from the prison's Program

Review Committee, each of which suggests that he received "all of the process he was due."

_Shoats,_ 213 F.3d at 144-47 (granting summary judgment in favor of defendants, despite that plaintiff had a protected liberty interest in avoiding isolation in administrative custody, because "the procedures provided were sufficient to protect Shoats from being improperly held in solitary confinement."). _See also_ _Porter v. Pennsylvania Department of Corrections,_ 2018 WL 5846747, at * 8 (W.D. Pa. Nov. 8, 2018) (because plaintiff "continues to be afforded the opportunity to challenge his death sentence and the terms of his confinement," "it cannot be said that [he] has been deprived of a liberty interest without adequate process.").[6] As such, Plaintiff cannot establish a violation of his procedural due process rights and summary judgment is warranted.

## IV. CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment (ECF No. 91) will be GRANTED. Judgment will be entered in favor of Defendant and against Plaintiff pursuant to Rule 58 of the Federal Rules of Civil Procedure. An appropriate order follows.

/s/ Richard A. Lanzillo _____
RICHARD A. LANZILLO
United States Magistrate Judge

Dated: December 28, 2018

---

[6] Notably, Plaintiff declined to participate in any of his misconduct hearings and does not appear to argue that the procedural protections provided during those hearings were inadequate. _See, e.g.,_ _Shoats,_ 213 F.3d at 146 ("[Plaintiff] does not argue that he was denied the opportunity to respond or be heard, nor does he argue that the prison authorities failed to consider favorable information or that they otherwise dealt with his case in a perfunctory manner.").